**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JKL Digital Capital Limited,[1] | Chapter 15 |
| Debtor in a Foreign Proceeding. | Case No. 25-12250-pb |

**SUPPLEMENTAL DECLARATION OF FOREIGN REPRESENTATIVE IN FURTHER SUPPORT OF VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVES, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Hadley Chilton, to the best of my information and belief, state as follows:

1.      I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (the "Supplemental Declaration") based upon my own personal knowledge except for those portions specified as being otherwise.

2.      As directed by the Court at the hearing held on November 13, 2025, I am submitting this Supplemental Declaration in further support of the *Motion for (I) Recognition of the Foreign Main Proceeding, (II) Recognition of the Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Dkt. No. 2] (the "Motion")[2] and as a supplement to the *Declaration of Foreign Representative in Support of Verified Petition for (I) Recognition of the Foreign Main Proceeding, (II) Recognition of the Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Dkt. No. 3] (the "First Declaration").[3]

---

[1]     The chapter 15 Debtor along with the last four digits of the Debtor's business number is JKL Digital Capital Limited (4314).  The Debtor's registered office is located at 80 Main Street, P.O. Box 3200, Road Town, Tortola VG 1110 British Virgin Islands.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3]     All statements set forth in the First Declaration are incorporated herein by reference as if fully set forth herein.

3.      Unless otherwise indicated herein, the facts and matters contained in this Supplemental Declaration are gained from my own review of the files and records relating to the Debtor or other information available to me.  Where any facts or matters are not within my knowledge, the source of my information is stated, and those facts and matters are true to the best of my knowledge, information, and belief.

***The Debtor is Incorporated in the BVI and Maintains its Registered Office and Agent There***

4.      The Debtor was incorporated in the British Virgin Islands ("BVI") on February 5, 2021 under the BVI Business Companies Act.

5.      Since its incorporation, the Debtor maintained the same registered agent, JTC (BVI) Limited, and the same registered office, both of which are located at 80 Main Street, PO Box 3200, Road Town, Tortola VG1110, BVI.  The registered office and the registered agent is moved to the offices of one of the Joint Liquidators, as is customary, with Glenn Harrigan in the BVI.

6.      The Debtor pays an annual fee to the BVI Financial Services Commission, Registry of Corporate Affairs to maintain its good standing in the BVI.

***The Debtor's Governing Documents are Governed by BVI Law***

7.      At all relevant times of operation prior to the commencement of the Foreign Proceeding, the Debtor's business was governed by two agreements: the Investment Agreement and the Custodial Agreement (together, the "Agreements").  A true and accurate copy of the Investment Agreement is attached as **Exhibit A** and a true an accurate copy of the Custodial Agreement is attached as **Exhibit B**.

8.      The Agreements, which provided the framework for the Debtor's operations, rely on BVI law.  The Investment Agreement expressly provides that it is governed by and construed in accordance with the laws of the BVI.  Although the Custodial Agreement does not expressly

contain a governing law provision, it provides that it is "subject to" and "in addition to" the terms and conditions set forth in the Investment Agreement.

9.      The Investment Agreement generally provides that the Debtor would enter into investment transactions on its client's behalf and provide attendant advisory services in accordance with agreed upon investment objectives.  The Investment Agreement contemplates that the Debtor would open client sub-accounts at Binance (the "Custody Accounts") for this purpose.  The Investment Agreement further provides that the Debtor would earn management and performance fees for its services, which it would deduct from the Custody Accounts when earned.

10.     The Custodial Agreement provided for the manner by which the Debtor would exercise custody services over the investment assets, which generally consisted of digital assets. In sum, the Custodial Agreement provided that the Debtor would keep its client's assets segregated in the Custody Accounts and act as a bailee of those assets.  In practice, however, I understand that the Debtor routinely commingled its assets with those of its client in the Custody Accounts.

11.     Over the course of the Agreements, the original counterparty, Unifi Group Limited ("Unifi"), a BVI company, and TGT, LP, as applicable, transferred digital assets into the Custody Accounts for the purpose of investment advice, management, and custody as per the terms of the Agreements.

12.     The Debtor provided weekly progress reports to TGT, LP regarding its investment activities and the fees earned therefrom.  Those reports stopped in or around March 2023, after TGT, LP discovered that such reports had been manipulated to hide losses suffered by the crash of various cryptocurrency exchanges.  All correspondence from the Debtor stopped in November 2023.  I have no basis to believe that the Debtor continued to actively operate any business after March 2023.

13.    Unifi listed a BVI address as its notice address in the Investment Agreement. When Unifi novated the Agreements to TGT, LP, with the consent of the Debtor, the governing law provision was not amended, thus ensuring the performance of the Debtor's services would continue to be governed by BVI law.

***The Debtor's Only Known Assets are Located in the BVI and the United States***

14.    Since I was first appointed as a joint voluntary liquidator of TGT, LP and after my appointment as one of the Joint Liquidators of the Debtor, I have issued numerous requests (the "Information Requests") in an attempt to identify the scope of the Debtor's assets. The Debtor's current and former directors (the "Directors"), however, have either not provided adequate responses or been evasive. The Directors have statutory obligations, pursuant to the BVI Insolvency Act of 2003 (the "BVI Insolvency Act"), to provide the assets, including books and records, to the Joint Liquidators.

15.    The only known assets of the Debtor are its (i) books and records maintained by its registered agent in the BVI and (ii) $10,000 retainer in a bank account located in the United States.

***Most of the Debtor's Known Affiliates Were Incorporated in the BVI***

16.    Over half of the Debtor's known affiliates[4] are incorporated in the BVI and maintain or, where no longer active, maintained their respective registered offices and registered agents in the BVI. To the best of my knowledge, the active affiliates continue to pay annual fees to the BVI Financial Services Commission, Registry of Corporate Affairs to maintain their good standing in the BVI.

---

[4]    These affiliates include JKL (2002) LTD., JKL Capital Limited, JKL Capital Investments Ltd, JKL Capital Management Limited, JKL Digital Capital Group Limited,,, JKL International Ltd., JKL Investments Ltd., JKL One Limited, JKL Professional Services Ltd, JKL Satori Trading Limited, JKLD Limited, JKLM Investments Limited, and Vulcan One Holdings Limited.

***The Decision to Commence the Foreign Proceeding in the BVI Was Legitimate and Supported by Creditor Expectations***

17.     TGT, GP, exercising its legal authority as general partner of TGT, LP, filed the application to commence the Foreign Proceeding in the BVI.

18.     The application was filed with the assistance of BVI counsel.

19.     In my position as joint voluntary liquidator of TGT, GP, I affirm that the decision to commence the Foreign Proceeding in the BVI was made based almost solely on the Debtor's place of incorporation and registered office.

20.     Given that the Agreements were novated for TGT, LP's benefit and TGT, LP was aware that the Debtor was a BVI entity operating pursuant to Agreements governed by BVI law, TGT, LP did not expect that a liquidation of the Debtor would proceed anywhere other than in the BVI.

***The Joint Liquidators, One of Which Resides in the BVI, Have the Power to Act Independently and Exclusively Manage the Debtor's Affairs Remotely from the BVI, Guernsey, and England***

21.     Since the commencement of the Foreign Proceeding nearly a year ago, the Debtor's affairs have been administered exclusively by the three Joint Liquidators: Stephen Cork, Glenn Harrigan, and me.

22.     I understand that pursuant to Section 175 of the BVI Insolvency Act, the commencement of the Foreign Proceeding, among other things, placed the custody and control of the Debtor's assets and affairs with the Joint Liquidators and stripped the Debtor's directors and officers of any powers other than those expressly authorized by the Joint Liquidators.

23.     Mr. Cork and I are both Partners at Cork Gully LLP ("Cork Gully"), a Limited Liability Partnership registered in England and Wales with a registered office at 6 Snow Hill, London EC1A 2AY.  Cork Gully is an international advisory firm, with offices located in England, New York, Guernsey, Jersey, Luxembourg, the Cayman Islands, and Mauritius.

24. Mr. Cork resides in England and works primarily out of Cork Gully's London office. I reside in Guernsey, and work primarily out of the St. Peter Port office.

25. Mr. Harrigan resides in the BVI. He is a licensed BVI insolvency practitioner employed by CCP Consultants, with offices located at Ellen L. Skelton Building, P.O. Box 3274, Road Town, Tortola VG 1110, BVI.

26. Mr. Cork and I are routinely appointed as joint liquidators and ordinarily conduct the liquidation process remotely. Mr. Harrigan, however, presides over all court proceedings and supervises every aspect of the Foreign Proceeding, including filings, ensuring compliance with BVI law and the rules of the BVI Court.

27. Each of the Joint Liquidators were approved by the BVI Financial Services Commission and the BVI Court, and I was a BVI licensed Insolvency Practitioner for ten years.

28. The Appointment Order provides that the Joint Liquidators are "joint and several" liquidators. I understand that each of the Joint Liquidators can act independently without the need for majority approval. In practice, however, the Joint Liquidators collaborate on all affairs and generally make major decisions with unanimous consent. For example, the Joint Liquidators conferred and unanimously agreed to retain Seward & Kissel LLP and to file the Petition for Recognition.

29. In carrying out our work of administering the Debtor's affairs, the Joint Liquidators typically correspond and hold meetings remotely via telephone, video conference, and email, with some meetings being in-person. When there are hearings before the BVI Court, we have so far generally been represented by Campbells, a law firm located in the BVI, while the Joint Liquidators remain available, with the nature of the applications so far having been straightforward.

6

30.    Decisions made by the Joint Liquidators in the Foreign Proceeding are made in conjunction with, and based on the advice of Campbells.  The Joint Liquidators have conducted the business of the Debtor through the BVI in this manner since January of 2025.

***The BVI Court Offers the Necessary Tools for an Efficient Liquidation to Maximize Value for the Debtor's Creditors and Shareholders***

31.    Since the commencement of the Foreign Proceeding, the Debtor, through the Joint Liquidators, has been focused on winding up its affairs by identifying and marshalling assets, ascertaining liabilities, with a view to, ultimately, distributing any residual assets to creditors and/or shareholders in accordance with the BVI Insolvency Act.  The supervision of the BVI Court has facilitated a transparent and fair liquidation process that allows the Joint Liquidators to maximize value for the Debtor's creditors and shareholders.

32.    The Foreign Proceeding serves an essential function because it provides the Joint Liquidators and the Debtor's creditors with a centralized forum in the BVI and equips the Joint Liquidators with the tools necessary to achieve due investigation and an orderly winddown of the Debtor's affairs.

33.    The Foreign Proceeding enables the Joint Liquidators to convene creditor meetings and administer claims in accordance with the BVI Insolvency Act.  If additional creditors are identified, I understand that the Joint Liquidators may need to conduct such a meeting, which we would likely conduct in a hybrid format—both in person in the BVI and remotely via a teleconference or videoconference service, as we anticipate any customers of the Debtor were international.

34.    The Foreign Proceeding also provides an enforcement mechanism for the BVI Insolvency Act.  For example, the Directors' failure to comply with Information Requests may constitute a breach of their statutory obligations, and I believe it is likely that the Joint Liquidators

will require the BVI Court's assistance to compel compliance or to otherwise authorize remedial action in the near future.

35.    Additionally, I understand that, as directors of a BVI company, the Directors owed fiduciary duties under BVI Business Companies Act of 2004.  Should the Joint Liquidators' ongoing investigation uncover estate claims against the Directors—which appears probable—the Joint Liquidators can utilize the Foreign Proceeding to advance claims against the Directors, which I understand will be governed by BVI law.

36.    Further, the BVI Court will likely play a pivotal role in resolving complex ownership and distribution issues arising from the Debtor's apparent commingling of its assets with those of its client.  I expect these disputes will hinge on the interpretation of the Agreements, which are governed by the laws of the BVI—making the BVI Court the most appropriate forum to adjudicate any disputes.

***The BVI Court Authorized the Joint Liquidators to Seek Recognition of the Foreign Proceeding as a Foreign Main Proceeding***

37.    On September 30, 2025, the BVI Court authorized the Joint Liquidators to apply to this Court for recognition of the Foreign Proceeding as a "main" proceeding under chapter 15 of the Bankruptcy Code.  A copy of that authorization is attached as **Exhibit C**.

***The Debtor's Only Legitimate Creditor Consents to the Foreign Proceeding Being Considered a Foreign Main Proceeding***

38.    The Debtor's only known and verified creditor is TGT, LP, an exempted limited partnership established under the laws of the Cayman Islands with its registered office located in the Cayman Islands.  TGT, LP is subject to liquidation proceedings pending in the Cayman Islands, where Stephen Cork and I have been appointed joint voluntary liquidators.[5]

---

[5]    TGT, LP's general partner is TGT, GP.  TGT, GP is also subject to liquidation proceedings pending in the Cayman Islands, where Stephen Cork and I have also been appointed joint voluntary liquidators.

39.     The Debtor has received a claim form from one of the Directors through his BVI counsel.  Based on preliminary review, the Joint Liquidators expect such claim to be disallowed.  The claim is based on a purported loan made *prior to* the Debtor's incorporation (evidenced by a BVI-governed loan agreement).  A review of the Debtor's limited books and records as well as correspondence with the Directors, however, has not provided the Joint Liquidators with sufficient information to determine whether any creditors exist other than TGT, LP.  That Director, while I note he has obligations, qua director, to provide the missing books and records, in submitting his claim has submitted to the BVI jurisdiction and expects a creditor claim to be adjudicated there.

40.     The Joint Liquidators also provided publication notice of the Foreign Proceeding in an effort to ascertain any additional creditors.  Specifically, statutory notice of the Foreign Proceeding, in accordance with the BVI Insolvency Act, was published in the Financial Times on January 30, 2025, the BVI Gazette on February 6, 2025, and the BVI Beacon on February 6, 2025.  Those notices provided contact information for the Joint Liquidators and directed all creditors of the Debtor to submit details of their claims via email as soon as possible.  Other than noted above, no claim information has been received as the date hereof.

41.     To date, the Joint Liquidators have no reason to believe that the Debtor has any creditor other than TGT, LP.  In my position as joint voluntary liquidator of TGT, LP, I affirm that TGT, LP received notice of the Petition for Recognition and consents to the relief requested therein.

42.     In sum, the Debtors "nerve center" is located in the BVI: (i) the Debtor is incorporated there, (ii) the Debtor's primary operating agreements are both governed by BVI law, (iii) one of the Joint Liquidators, who is authorized to act individually on behalf of the Debtor, resides in the BVI, (iv) the Joint Liquidators have operated through the BVI and rely on the advice

of BVI counsel, (v) a substantial portion of the Debtor's known assets are located there (and there is the potential that additional assets are located there if the Debtor ultimately brings claims against the Directors), (vi) the Debtor's only legitimate creditor not only initiated the Foreign Proceeding in the BVI but also consents to a finding that BVI is the Debtor's center of main interest, (vii) no party in interest has objected to the relief sought in the Motion, and (viii) the BVI Court, where the Debtor's affairs have been managed for nearly a year, is uniquely situated to ensure an orderly winddown of the Debtor's assets in a way that best maximizes value for its estate.  Furthermore, although the Debtor may have discrete connections around the globe, I am not aware of any information that leads me to believe that the Debtor's "nerve center" at the time of the filing of the Petition for Recognition (or any other time) was located somewhere other than the BVI.

43.    For the reasons stated in this Supplemental Declaration and the Initial Declaration, I request that the Motion be granted, together with such other and further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  November 26, 2025

_____

Hadley Chilton

SK 39065 0002 12043966 vFinal

**<u>Exhibit A</u>**

**JKL DIGITAL CAPITAL LTD**


**INVESTMENT ADVISORY AGREEMENT**
(the "Agreement")


dated 28th day of May 2021



between:


UNIFI GROUP LIMITED
Craigmuir Chambers,
Road Town, Tortola,
British Virgin Islands, VG1110
(the "Client")

- AND -


JKL DIGITAL CAPITAL LTD

28/F, AIA Central

1 Connaught Road Central, Hong Kong

(the "Adviser")

1.  **Scope of Engagement.**

    1.1  The Client hereby appoints the Adviser as an Investment Adviser to perform the services hereinafter described, and the Adviser accepts such appointment. The Adviser shall be responsible for the investment and reinvestment of those crypto assets of the Client designated by the Client to be subject to the Adviser's management (such crypto assets, together with all additions, substitutions and/or alterations thereto are hereinafter referred to as the "Assets" or "Account").

    1.2  Advisor shall invest the Account assets in accordance with the investment objectives, guidelines and other information provided in **Exhibit A** (which is attached hereto and made a part hereof). **Exhibit A** may be revised from time to time by Client with prior written notice to Advisor.

    1.3  The Client delegates to the Adviser all of its powers with regard to the investment and reinvestment of the Assets and appoints the Adviser as the Client's attorney and agent in fact with full authority to buy, sell, or otherwise effect investment transactions involving the Assets in the Client's name and for the Client's Account.

    1.4  Client acknowledges and understands that the service to be provided by the Adviser under this Agreement is limited to the management of the Assets and does not include financial planning or any other related or unrelated services.

2.  **Asset Under Management.** The Advisor will open custodial Sub Accounts for the Client under the Advisors' Master Trading Account with Binance to invest on the Client's behalf. The Client agrees to transfer his/her digital assets to the Advisors Sub Accounts in which the Advisor will execute his scope of engagement described in Section 1.

| Exchange | Account | Asset | Amount |
|---|---|---|---|
| Binance | Sub Account | BTC | TBC |
| Binance | Sub Account | ETH | 0x7f139f79259b35cdc8dc64a496ca20808641b978 |
| Binance | Sub Account | USDT | 0x7f139f79259b35cdc8dc64a496ca20808641b978 |

3.  **Adviser Compensation.** The Client agrees to pay Advisor fees pursuant to the fee schedule (the "Fee Schedule") which is attached hereto and made a part hereof as **Exhibit B**.

4.  **Risk Acknowledgment.** Adviser does not guarantee the future performance of the Account or any specific level of performance, the success of any investment decision or strategy that Adviser may use, or the success of Adviser's overall management of the Account. Client understands that investment decisions made for the Account by Adviser are subject to various market, economic, political, and business risks, and that those investment decisions will not always be profitable.

5.  **Directions to the Adviser.** All directions by the Client to the Adviser (including notices, instructions, directions relating to changes in the Client's investment objectives) shall be in writing (electronic communication will suffice). The Adviser shall be fully protected in relying upon any such direction, notice, or instruction until it has been duly advised in writing of changes therein.

6.  **Adviser Liability.**

    6.1  The Adviser, acting in good faith, shall not be liable for any action, omission, investment recommendation/decision, or loss in connection with this Agreement including, but not limited to, the investment of the Assets, or the acts and/or omissions of other professionals or third-party service providers recommended to the Client by the Adviser.

    6.2  If the Account contains only a portion of the Client's total assets, Adviser shall only be responsible for those assets that the Client has designated to be the subject of the Adviser's investment management services under this Agreement without consideration to those additional assets not so designated by the Client.

    6.3  If, during the term of this Agreement, the Adviser purchases specific individual crypto assets for the Account at the direction of the Client (i.e., the request to purchase was initiated solely by the Client), the Client acknowledges that the Adviser shall do so as an accommodation only, and that the Client shall maintain exclusive ongoing responsibility for monitoring any and all such individual crypto assets, and the disposition thereof. Correspondingly, the Client further acknowledges and agrees that the Adviser shall not have any responsibility for the performance of any and all such crypto assets, regardless of whether any such crypto asset is reflected on any quarterly account reports prepared by Adviser.

    6.4  The Client acknowledges that investments have varying degrees of financial risk, and that Adviser shall not be responsible for any adverse financial consequences to the Account resulting from any investment that, at the time made, was consistent with the Client's investment objectives.

7.  **Reports.** Adviser and/or Account custodian shall provide Client with periodic reports for the Account. The report details and deliveries will be mutually agreed between Client and Adviser.

8.  **Holding Period.** A minimum holding period of ninety (90) days is required. The start date of the Engagement is the date the Client transfer its digital assets to the Advisor's crypto wallet address.

9.  **Termination.** This Agreement will continue in effect until terminated by either party by upon 1 month written notice (electronic communications will suffice) after the minimum holding period of ninety (90) days. Termination of this Agreement will not affect (i) the validity of any action previously taken by Adviser under this Agreement; (ii) liabilities or obligations of the parties from transactions initiated before termination of this Agreement; or (iii) Client's obligation to pay advisory compensation (as known as the performance fee stated in Exhibit B). Upon the termination of this Agreement, Adviser will have no obligation to recommend or take any action with regard to the crypto assets in the Account.

10. **Trade Errors.** All Account trades are placed electronically by Adviser. Adviser assumes responsibility for any Account losses for trading errors directly resulting from Adviser's failure to follow Adviser's trading procedures. The Client acknowledges that Adviser cannot and will not be responsible for Account errors and/or losses that occur where Adviser has used its best efforts (without direct failure on the part of Adviser) to execute trades in a timely and efficient manner. If a trade or some portion of a trade is not affected or an electronic "glitch" occurs which results in the Account not being traded at the same time or at the same price as others, and such occurrence is not a result of Adviser's failure to execute or follow its trade procedures, the resulting loss will not be considered a trading error for which Adviser is responsible.

11. **Contractor Responsibility.** The Client acknowledges that Adviser cannot and will not be responsible for:

11.1  "Force Majeure": means circumstances and conditions beyond the control of either parties, that would render it impossible for either the Owner or the Contractor to fulfil their obligations under this Contract or delay such fulfilment. Any of the following matters are considered "force majeure";

11.1.1  war, hostilities, act of foreign enemy, invasion, warlike operation (whether war to be declared or not) or civil war;

11.1.2  mutiny, civil commotion assuming the proportions of or amounting to a popular rising, military rising, insurrection, rebellion, revolution, military or usurped power, or any act of any person acting on behalf of or in connection with any organization with activities directed towards the overthrow by force of the Government de jure or de facto, or to the influencing of it by terrorism or violence;

11.1.3  earthquake, flood, fire or other natural physical disaster;

11.1.4  Cryptocurrency exchange hacks;

11.2  and other unforeseen circumstances beyond the control of the parties so affected rendering the fulfilment of their obligations impossible.

12. **Authority.** The Client acknowledges that he/she/they/it has (have) all requisite legal authority to execute this Agreement, and that there are no encumbrances on the Assets. The Client correspondingly agrees to immediately notify the Adviser, in writing, in the event that either of these representations should change

13. **Confidentiality.** (a) Client agrees to hold confidential any non-public or proprietary (i) information, analyses, advice or recommendations of Advisor supplied in connection with the opening of the Account and the trading of the assets of the Account, and (ii) designs, specifications, technical information and data, prototypes, models, documentation, media, codes, discoveries, technical know-how, methods, programs, procedures, business plans, marketing plans, business models, techniques, forecasts, projections, processes, formulae and/or formulary, research, developments, source codes, encryption or decryption keys or information, algorithms, commentary on codes, web site development plans and strategies, inventions, trademarks, trade names, trade secrets, proposals, intellectual property and financial information, whether

4

or not the same are, or may be, copyrighted, patented, registered, or otherwise publicly protected, and whether or not originated or generated by or through Advisor, and Client agrees to keep confidential any methodologies or models utilized in trading the Account.    Client further acknowledges that Client may come into contact with information concerning Advisor or one or more of its clients, affiliates and/or personnel and Client agrees that Client will not communicate, disclose or utilize for Client's own benefit or for the benefit of any other entity or persons, any and all information that is not in the public domain with regard to Advisor and/or its affiliates, clients and/or or personnel, including without limitation, and any or all procedures or techniques related to investment strategies, essential ideas and principles underlying such procedures.    All of the foregoing referred to in this <u>Section 6(a)</u> above shall be collectively referred to as "Confidential Information".

14. **No Partnership.** It is understood and agreed that Advisor shall be deemed to be an independent contractor of Client and, except as otherwise set forth herein, that Advisor shall not have authority to act for or represent Client in any way and shall not otherwise be deemed to be Client's agent.    Nothing contained herein shall create or constitute Client and Advisor as members of any partnership, joint venture, association, syndicate, unincorporated business, or other separate entity, nor shall be deemed to confer on any of them any express, implied, or apparent authority to incur any obligation or liability on behalf of any other such entity

15. **Notices.** Any notice, delivery, request, or other communication made with respect to this Agreement shall be in writing and shall be deemed to have been properly given or made if sent by hand delivery, overnight mail, courier, email, certified mail or facsimile, to the parties at the following addresses and shall be effective upon receipt.

|  |  |
|---|---|
| As to Advisor: | As to Client: |
| 28/F, AIA Central | Craigmuir Chambers |
| 1 Connaught Road Central | Road Town, Tortola |
| Hong Kong | British Virgin Islands, VG1110 |
| Email: lin.cheung@jkl.capital | Email:   justin@yield.app |
| Attention: Mr. Lin Cheung | Attention: Justin Wright |

16. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of British Virgin Islands.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

Advisor:

JKL Digital Capital Limited

By: _____

Name: Lin Cheung

Title:    Director


Client:

Unifi Group Limited

By: _____

Name: Justin Wright

Title:    Director

DocuSign Envelope ID: 4E09EB73-5458-4623-BBD9-6DAE495C5833

**Exhibit A**

**Investment Guidelines**

All capitalized terms used in this **Exhibit A** and not expressly defined herein shall have the same respective meanings as set forth in the Agreement to which this **Exhibit A** is attached (including the other Exhibits thereto).

Advisor will manage the Account utilizing its proprietary IP and processes.

The strategy utilizes a blend of systematic and discretionary trading across a variety of instruments on behalf of the Account, including, but not limited to, futures, options and derivatives. Advisor will utilize an analytical and statistical approach to managing risk and maintaining levels of diversity consistent with Advisor's research and technology outputs. Trading will be assessed based on expectancy, risk and volatility in an effort to manage risk.

The Advisors digital assets trading approach is based on two core sub-strategies: trend following and mean reversion. Capital allocation between these two sub-strategies is dynamic, and is continually rebalanced based on real-time data.

For the purposes of this Exhibit B of this IMA, JKL will provide a tailor-made solution combining the JKL quantitative trading strategy with its arbitrage strategy, whereby both strategies are actively reallocated and managed based on the market conditions.

**Exhibit B**

**Fee Schedule**

All capitalized terms used in this **Exhibit B** and not expressly defined herein shall have the same respective meanings as set forth in this Investment Management Agreement to which this **Exhibit B** is attached (including the other Exhibits thereto). All compensation shall be paid in the base currency of the capital allocation unless otherwise stated.

<u>*Management Fee*</u>. Client shall pay to Advisor an asset-based management fee of two (2%) percent per annum. For this purpose, Applicable Value shall be defined as the Net Asset Value before performance fee that is calculated monthly on the Valuation Day of each calendar month at a rate of 0.17% pcm. If the Adviser does not act as an Adviser for the whole of a calendar month, the Management Fee payable by the Fund for that calendar month will be prorated so that it is paid only for that part of the calendar month that it so acted.

"<u>Net Asset Value</u>" shall mean the Account's assets at fair value, less its liabilities, at fair value denominated in dollars. Conversion from non-USD instruments will be calculated at the prevailing exchange rates on Binance as of 0:00 UTC the first day of each new quarter. (Jan 1, Apr 1, Jul 1, Oct 1).

<u>*Performance Fee*</u>. With respect to all holdings in the Account, Client will pay to Advisor a monthly fee (the "<u>Performance Fee</u>") equal to thirty (30%) percent of the New Net Investment Profits (as defined below), of the Account as of the end of each Performance Period; <u>provided</u>, <u>however</u>, that the Performance Fee will be paid only if the Account has recovered the cumulative Net Losses (as defined below) and Accrued Hurdle (defined below) it sustained during all prior periods. The Performance Fee takes into account both realized and unrealized profits and losses, accrued at the end of each month, and vests at the end of each Performance Period.

The Performance Fee is payable in arrears, within 5 days following the end of the Performance Period on which such Fee is predicated. The Performance Fee will be calculated based on the New Net Investment Profits of the Account as of the last of each Performance Period. Should Client make a withdrawal from the Account, Advisor will be entitled to its Performance Fee with respect to the amounts withdrawn. Furthermore, in the event Client makes a withdrawal from the Account, any cumulative Net Loss shall be reduced by an amount equal to the product obtained by multiplying the amount of such Net Losses by a fraction, the numerator of which is equal to the amount of such withdrawal and the denominator of which is equal to the Net Asset Value of the equity portion of the Account immediately prior to such withdrawal. Once earned, a Performance Fee is non-refundable and shall not be affected by any subsequent losses.

- "<u>Accrued Hurdle</u>" – At the end of each Performance Period (Calendar monthly) the account is assessed a hurdle rate of 0.83% relative to the initial capital invested. Any month in which the net performance relative to the initial capital contribution is below 0.83% the difference between 0.83% and performance will result in accrual which is added to the subsequent month's hurdle. This shall represent the "Accrued Hurdle". No Performance Fee will be paid prior to the satisfaction of the either the hurdle rate or accrued hurdle.

- "Net Loss" of the Account means, with respect to any Performance Period, the excess of all expenses (including, but not limited to, ticket charges and brokerage commissions) and losses (realized and unrealized) incurred on an accrual basis by the Account with respect to the Account's holdings during the Performance Period over the aggregate revenue, income and gains (realized and unrealized) earned on an accrual basis by the Account with respect to the Account's holdings during the Performance Period.

- "Net Profit" of the Account means, with respect to any Performance Period, the excess of the aggregate revenue, income and gains (realized and unrealized) earned on an accrual basis by the Account with respect to the Account's holdings over the expenses (including, but not limited to, ticket charges and brokerage commissions) and losses (realized and unrealized) incurred on an accrual basis by the Account with respect to the Account's holdings during the Performance Period.

- "New Net Investment Profits" means the amount, if any, by which the Net Profits of the Account exceeds the Net Loss with respect to the holdings of the Account for the relevant Performance Period.

- "Performance Period" will begin as of the date of this documents execution and close June 30th, 2021. Each subsequent performance period will represent one calendar month commencing on Jul 1st 2021 at 0:00 UTC.

**Exhibit B**

DocuSign Envelope ID: 4E09EB73-5459-4623-BBD9-6DAE495C5833

**JKL DIGITAL CAPITAL LTD**

**CUSTODIAL SERVICES AGREEMENT**
(the "Agreement")

dated 28th day of May 2021

between:

UNIFI GROUP LIMITED
Craigmuir Chambers,
Road Town, Tortola,
British Virgin Islands, VG1110
(the "Client")

- AND -

JKL DIGITAL CAPITAL LTD
28/F, AIA Central
1 Connaught Road Central, Hong Kong
(the "Adviser")

## SECTION 1
## INTRODUCTION

The client agrees to have JKL Digital Capital Ltd. to custody assets, including Digital Assets, and this arrangement is subject to the terms and conditions set forth in the Investment Management Agreement.

## SECTION 2
## USE OF CUSTODY SERVICES

The Client agrees and understands that this Custody Services Agreement is subject to the terms and conditions set forth in the Investment Management Agreement. The terms and conditions set forth in this Custody Services Agreement are in addition to those set forth in the Investment Management Agreement and that the former shall prevail for matters specifically dealt with in this Custody Services Agreement in case of conflict. The Client further agrees and understands that the define terms used in this Custody Services Agreement, if defined in the Investment Management Agreement, shall have the meanings set forth in the Investment Management Agreement.

The Client understands that by using the Custody Services following and change to this Custody Services Agreement, the use of our custody services shall constitute the Clients agreement to the amended  by and between the Advisor and the Client, and Client agrees to be legally bound by its terms and conditions as amended. The Client should, therefore, read this Custody Services Agreement from time to time. The Client further accepts and understands that the Advisor has the right to require Clients affirmative consent and continuing acceptance of this Custody Services Agreement, from time to time, as a condition of using the custody services. If the Client does not agree to be bound by this Custody Services Agreement, the Client should not use our services.

## SECTION 3
## INTERPRETATION

3.1.    The Client agrees and understands that the defined terms used in this Custody Services Agreement, if not defined in our Investment Management Agreement, shall have the meanings set forth below:

**"Assets"** means any supported digital assets (which, for the purpose of this Custody Agreement, also includes Supported Cryptoassets) that have been Delivered to us to be held in a Custody Account established by us on your behalf, in each case until such Assets are withdrawn or cease to be Assets pursuant to this Custody Agreement and/or the Investment Management Agreement. Assets shall also mean any asset resulting from forks that we, in our sole discretion, deem to be a Supported Digital Asset.

**"Asset Balance"** means the quantity of each Asset denominated in the appropriate Supported Digital Asset type.

**"Authorized Person"** is any person designated by you to have access to your Custody Account based on the role-based permissions you assign.

**"Blockchain Address"** means a public address on a blockchain in which Assets can be held (including, but not limited to, a Bitcoin address for the Asset commonly known as bitcoin and an Ethereum address for the Asset commonly known as ether).

**"Cold Storage System"** means our proprietary any offline storage system that we use to custody your Assets.

**"Custody Interface"** means the interface of the exchange platforms utilised by the Advisor that allows for Custody Account actions including, but not limited to, the ability to view balances and request and approve withdrawals.

**"Custody-Only Assets"** means Assets for which we only provide custody services

**"Cut-Off Time"** means 0.00 UCT each business day.

**"Delivery"** (or "Deliver," Delivering," or "Delivered,") means the transfer of Supported Digital Assets to one or more Blockchain Addresses controlled by the receiving Party and provided by the receiving Party to the sending Party for such transfer. Supported Digital Assets will only be considered Delivered to us *after* the required number of network confirmations, as determined by us in our sole discretion, have occurred on the blockchain for such Supported Digital Assets.

**"Effective Date"** means the date of Delivery of Supported Digital Assets from you to us.

**"General Instructions"** means any notice, instruction, or other communication that is not Proper Instructions. We may rely upon any General Instruction that we believe in good faith has been given by an Authorized Person.

**"Other Functionality"** means functionality that may be associated with certain Assets including, but not limited to discretionary investment management services, staking, protocol governance, smart contract functionality, and other similar uses.

**"Parties"** (each, individually a "Party") means you or us.

**"Proper Instructions"** means instructions that have been entered and confirmed via our Custody Interface.

**"Withdrawal Request"** means a request sent to us via Proper Instructions that specifies the type and amount of Assets to be withdrawn from your Custody Account and the destination Blockchain Address.

4.    **Custodian Appointment**

You agree to hereby appoint us to act as the custodian of Assets to be held in your Custody Account in accordance with this Custody Agreement for the purpose of satisfying the terms and conditions set out in the Investment Management Agreement, and we accept such appointment and the obligations, duties, and responsibilities set out in this Custody Agreement. By entering into this Custody Agreement, you agree that you intend to create a bailment of Assets with us, and you agree that you intend that we be the bailee.

5.    **Custody Account**

You agree and understand that we will establish Custody Sub-Accounts Account at one or more Exchanges whereby we operate Master Accounts. Your Custody Account will have one or more associated unique Blockchain Addresses in which your Assets will be (i) segregated

from any and all other assets held by us and (ii) directly verifiable via the applicable blockchain. We will provide you with all Blockchain Addresses associated with your Custody Account.

The ownership of your Assets will be clearly recorded in our books as belonging to you. Our records will at all times provide for the separate identification of your Assets. We will not loan, hypothecate, pledge, or otherwise encumber any Assets in your Custody Account, absent General Instructions from you.

You agree and understand that nothing herein prevents us from using our Cold Storage System to custody our own property and/or the property of third parties; provided, however, that, at a minimum, separate Blockchain Addresses are utilized to segregate your Assets from such other property.

6.     **Delivery**

You agree and understand that Supported Digital Assets will only be considered Assets after they have been Delivered to a Blockchain Address provided by us to you. You agree and understand that we have no obligation with respect to any Supported Digital Assets unless such Supported Digital Assets have been so Delivered to us. In addition, you agree and understand that we are not required to accept Delivery of any Supported Digital Assets, and have no liability therefor (except, if delivered by you, to ensure return by Delivery of such Supported Digital Assets to you), if we believe that the acceptance thereof would or is reasonably likely to expose us or any of our affiliates to any liability (contingent or otherwise).

7.     **Deposits**

Deposits of Supported Digital Assets to a Blockchain Address of your Custody Account may occur without our involvement. Deposits will be credited to your Custody Account once they are Delivered.

8.     **Withdrawals**

Upon submission of a Withdrawal Request, all Authorized Persons will receive an email notification informing them of the Withdrawal Request. An Authorized Person (other than the Authorized Person who initiated the Withdrawal Request) must then approve the Withdrawal Request via return email and a secondary secure digital messaging application (a "Withdrawal Confirmation").

If only one Authorized Person is designated on the custodial Account, a Withdrawal Request will be approved following the secondary confirmation via a secure digital messaging application.

Once a Withdrawal Confirmation has been made, your Withdrawal Request will be processed within one Business Day of the next Cut-Off-Time subject to any other withdrawal conditions as set out in the Investment Management Agreement.

You agree and understand that with respect to Proper Instructions, we cannot authenticate whether or not such Proper Instructions originated from an Authorized Person.

You agree and understand that we have the right to refuse to execute any Withdrawal Request that we believe may be in violation of any applicable laws and regulations.

**You agree and understand that we may rely upon any action that we believe in good faith to have been taken by an Authorized Person.**

9.    **Fees**

You agree that the fees as set out in Exhibit B of the Investment management Agreement shall be applied and that the Advisor shall not charge any additional fees for the purposes set out in this Custodial Service Agreement.

10.    **Suspension or Termination**

You agree and understand that we have the right to suspend and/or terminate our custody services under this Custody Agreement pursuant to the terms set out in the Investment Management Agreement or as per any other terms set out by third-party Exchanges that are used to provide sub account custodial solutions whereby the Client is in breach of the user policies of such exchanges.

12.    **Representations, Warranties, and Covenants**

You hereby represent and warrant, which representations and warranties shall be continuing and shall be deemed to be reaffirmed each time you initiate a Withdrawal Request or Deliver a Supported Digital Asset to your Custody Account, that:

a)    You are at least 18 years old, have the legal capacity to enter into this Custody Agreement and agree to be legally bound by the terms and conditions of this Custody Agreement in their entirety;

b)    If you represent a legal entity, said legal entity is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

c)    You have the power to enter into this Custody Agreement and to make any Withdrawal Request, and to perform your obligations under this Custody Agreement;

d)    Performance of this Custody Agreement does not violate or conflict with any law, judgment, order, regulation, or contractual obligation applicable to or binding on you or any of your Assets;

e)    To the best of your knowledge, all required governmental and other consents that are required to have been obtained by you with respect to this Custody Agreement and any Withdrawal Request have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

f)    Your obligations under this Custody Agreement constitute your legal, valid, and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable

principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law));

g)   You are in compliance with all applicable laws and regulations, and have obtained all regulatory licenses, approvals and consents as applicable; without limiting the generality of the foregoing, you will not use the services provided by us hereunder in any manner that is, or would result in, a violation of any applicable laws and regulations;

h)   You are aware of and familiar with, and have been fully informed of, the risks associated with giving Proper Instructions, and are willing to accept such risks, and you shall (and shall cause each Authorized Person to) safeguard and treat with extreme care any credentials related to Proper Instructions. You understand that there may be more secure methods of giving or delivering Proper Instructions than the methods selected by us, and you agree that the security procedures (if any) to be followed in connection therewith provide a commercially reasonable degree of protection in light of particular needs and circumstances. You agree and understand that a Withdrawal Request given pursuant to Proper Instructions may conclusively be presumed by us to have been given by an Authorized Person, and (following a Call-back) may be acted upon as given;

i)   You agree and understand that Supported Digital Assets are new forms of assets, that the law regarding their ownership, custody, and transfer is developing and uncertain, and that custody of such assets poses certain risks that are not present in the case of more traditional asset classes; and you further agree and understand that you will bear such risks and the potential loss or diminution in value of Supported Digital Assets due to changes or developments in the law or conditions under existing law in which your rights in and to such Supported Digital Assets are not adequately protected;

j)   You agree and understand that (i) we do not own or control the underlying software protocols of networks or exchanges which govern the operation of Supported Digital Assets, (ii) we make no guarantees regarding their security, functionality, or availability, and (iii) in no event shall we be liable for or in connection with any acts, decisions, or omissions made by developers or promoters of such Supported Digital Assets;

k)   Upon the Delivery of Assets to your Custody Account, you have Delivered such Assets from a wallet that you own and control;

l)   You are, upon the submission of a Withdrawal Request for Assets from your Custody Account, Delivering such Assets to a wallet that you own and control;

m)  You are not, and no transferee of Assets pursuant to any Withdrawal Request is, (i) the target of any laws or sanctions programs administered by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the United Kingdom's Office of Financial Sanctions Implementation ("OFSI"), the European Union ("EU"), the United Nations ("UN"), Canada's Department of Foreign Affairs

DocuSign Envelope ID: 4E09EB73-5458-4623-BBD9-6DAE495C5832

and International Trade ("DFAIT"), or any other governmental entity imposing economic sanctions and trade embargoes ("Economic Sanctions Laws"), or (ii) located, organized, or resident in a country or territory that is, or whose government is, the target of sanctions imposed by OFAC, OFSI, the EU, the UN, DFAIT or any other governmental entity;

n) You are not the issuer, a sponsor or an affiliate of the issuer or sponsor of any Assets in your Custody Account; and

o) You may disclose to third parties the fact that you are a party to this Custody Agreement, but such disclosure shall neither state nor imply that we (i) are providing any services to you other than those expressly provided herein or (ii) endorse any Assets or any projects related thereto

We hereby represent and warrant, which representations and warranties shall be continuing and shall be deemed to be reaffirmed each time we process a Withdraw Request, that:

a) We are duly organized and validly existing under the laws of the jurisdiction of our organization or incorporation and, if relevant under such laws, in good standing;

b) We have the power to execute and deliver this Custody Agreement and to satisfy any Withdrawal Request submitted by you, and to perform our obligations under this Custody Agreement, and we have taken all necessary action to perform our obligations under this Custody Agreement;

c) Such performance of our obligations under this Custody Agreement do not violate or conflict with any existing law, judgment, order, regulation, or contractual restriction applicable to or binding on us;

d) Our obligations under this Custody Agreement constitute our legal, valid, and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law));

For the avoidance of doubt, the representations and warranties in this section are in addition to, not in place of, those set forth in the User Agreement.

13.    **Custodial Obligations**

a) You understand that we use reasonable care in connection with the maintenance of your Custody Account and the custody of your Assets. Notwithstanding the foregoing, no provision of this Custody Agreement shall require us to expend or risk our own funds, property, or otherwise incur any financial liability, in the performance of any of our duties hereunder.

b) You agree and understand that Forks may result in Forked Networks and us holding an identical amount of Digital Assets associated with each Forked Network. You further agree and understand that with respect to Forks, we will act in accordance with and pursuant to the User Agreement, entered into by and between you and us, and amended from time to time.

c) You agree and understand that, unless provided explicitly in this Custody Agreement, as may be revised from time to time, we will not support any Other Functionality associated with any Assets.

d) You agree and understand that in the event of a market disruption, we may, in our sole discretion, do one or more of the following: (i) suspend access to our custody services; or (ii) prevent you from completing any actions via our custody services. We are not liable for any losses suffered by you resulting from such actions. Following such an event, when custody services resume, you agree and understand that the prevailing market prices may differ significantly from the prices prior to such event.

e) You agree and understand that in no event shall either Party be liable under or in connection with this Custody Agreement for indirect, special, incidental, punitive, consequential losses, or damages of any kind whatsoever, including, but not limited to, lost profits, whether or not foreseeable, even if the Party has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

f) You understand that we keep and maintain, or cause to be kept, accurate books and records with respect to any Custody Account and Assets, including with respect to the receipt and withdrawal or transfer thereof.

g) You agree and understand that we maintain the right to retain or set-off, against any Assets (or the value thereof, as reasonably determined in our sole discretion), any obligations that you may have to us.

h) You agree and understand that we are authorized to supply any information regarding any Custody Accounts or Assets that is required by any law, regulation, or rule now or hereafter in effect, or which may be requested by law enforcement. To the extent permitted by law, we may provide you with notice of any such request for information.

i) You agree and understand that we have no duties or responsibilities with respect to any Custody Account or Assets except such duties and responsibilities as are specifically set forth in this Custody Agreement, and no covenant or obligation shall be implied against us in connection with this Custody Agreement.

j) You agree and understand that we maintain a commercially reasonable system for (i) recovery, in case of disaster, of all of its records associated with your Custody Account, and (ii) the continued provision of the services under this Custody Agreement in the event of any downtime or maintenance

k)  You agree and understand that we will not be responsible for trading account losses that occur as a result of default on exchanges (such as "fraud", "security failures", "hacking", "cyber-attack", "operational failures", "technology failures")

14.    **Your Obligations**

a)  You agree to indemnify and hold us and our affiliates harmless from and against any and all losses, claims, or liabilities (including reasonable fees and expenses of counsel) incurred by or asserted against us by reason of, or in connection with, any action or inaction by you, or otherwise arising out of your performance hereunder. This indemnity shall be a continuing obligation of you and your successors and assigns, notwithstanding the termination of the services provided under this Custody Agreement.

b)  You agree to be responsible for, and shall pay, all taxes, assessments, duties, and other governmental charges, including any interest or penalty rightfully owed by you with respect thereto, with respect to any Assets or any transaction related thereto.

c)  You agree and understand that you and any and all Authorized Persons are required to successfully complete our  customer onboarding process pursuant to our applicable compliance policies, which may be amended from time to time.

d)  You agree that you will promptly inform us if (i) you are or become the target of any laws administered by OFAC, OFSI, the EU, the UN, DFAIT or any other governmental entity imposing economic sanctions and trade embargoes, (ii) you are or become located, organized, or resident in a country or territory that is, or whose government is, the target of sanctions imposed by OFAC, OFSI, the EU, the UN, DFAIT or any other governmental entity, or (iii) you become aware that you or any Asset, or any transaction involving an Asset, are or become the target of any investigation (including the reasonable details thereof).

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

Advisor:
JKL Digital Capital Limited

By: _____

Name: Lin Cheung
Title:  Director

Client:
Unifi Group Limited

By: _____

Name: Justin Wright
Title:  Director

**Exhibit C**

**Case Number :BVIHCOM2024/0614**

**FILED**
**HIGH COURT**
**TERRITORY OF**
**THE VIRGIN ISLANDS**

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
(COMMERCIAL DIVISION)
CLAIM NO. BVIHC (COM) 2024/0614

IN THE MATTER OF JKL DIGITAL CAPITAL LIMITED (IN LIQUIDATION)
AND IN THE MATTER OF THE INSOLVENCY ACT, 2003

**Submitted Date:01/10/2025 10:09**

**Filed Date:01/10/2025 10:37**

**Fees Paid:72.59**

BETWEEN:

Hadley Chilton, Stephen Cork and Glenn Harrigan in their capacity as Joint Liquidators of JKL Digital
Capital Limited (In Liquidation)

<u>Applicants</u>

-and-

JKL Digital Capital Limited (in Liquidation)

<u>Respondent</u>

---

**ORDER**

---

BEFORE:        The Honourable Mr. Justice Abbas Mithani (Ag.)

DATED:        24 September 2025

ENTERED:    2 October    2025

UPON the ordinary application of Hadley Chilton, Stephen Cork and Glenn Harrigan in their capacity as the
joint liquidators (together, the "**Joint Liquidators**" or "**Applicants**") of JKL Digital Capital Limited (In
Liquidation) (the "**Respondent**") dated 24 July 2025, for the Court's sanction under Section 186(3) and (5)
of the Insolvency Act, 2003 (the "**Application**");

AND UPON READING the Fourth Affidavit of Hadley Chilton dated 24 July 2025 and Exhibit HC-4 of the same
date, in support of the Application;

AND UPON hearing Mr Jomokie Phillips, of Campbells, legal practitioners for the Joint Liquidators;

#3358664v1

**IT IS HEREBY ORDERED AND DIRECTED THAT:**

1. The Applicants are granted sanction to apply to the Bankruptcy Court for the Southern District of New York for recognition of the BVI liquidation of the Respondent, pursuant to Chapter 15 of the U.S. Bankruptcy Code as either a "main" or "non-main" proceeding.

2. Any person affected by this Order shall be entitled to apply to have it varied or set aside provided that any such application is made within seven (7) days of the Order being received by that person.

3. The costs of this Application shall be treated as costs in the liquidation.

**BY THE COURT**

_____
Dep. REGISTRAR

2

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
(COMMERCIAL DIVISION)
CLAIM NO. BVIHC (COM) 2024/0614

IN THE MATTER OF JKL DIGITAL CAPITAL LIMITED
(IN LIQUIDATION)
AND IN THE MATTER OF THE INSOLVENCY ACT,
2003

BETWEEN:

Hadley Chilton, Stephen Cork and Glenn Harrigan
in their capacity as Joint Liquidators of JKL Digital
Capital Limited (In Liquidation)
<u>Applicants</u>

-and-

JKL Digital Capital Limited (in Liquidation)
<u>Respondent</u>

---

**ORDER**

---

**Campbells**
Floor 4, Banco Popular Building,
Road Town, Tortola, VG1110,
British Virgin Islands
Tel:  +1 284 494 2423
Reference: 17309-44762
**Legal Practitioners for the Applicants**

3